IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 2, 2026

## IN RE OTHELLA S.

**Appeal from the Juvenile Court for Sumner County**
**No. 2023-TPR-2     N. Kee Bryant-McCormick, Judge**

_____

**No. M2025-01263-COA-R3-PT**

_____

Mother/Appellant appeals the termination of her parental rights to the minor child on the grounds of: (1) severe child abuse, Tenn. Code Ann. § 36-1-113(g)(4); and (2) failure to manifest an ability and willingness to assume custody, Tenn. Code Ann. § 36-1-113(g)(14). Appellant also appeals the trial court's finding that termination of her parental rights is in the child's best interest. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed and Remanded**

STEVEN W. MARONEY, J., delivered the opinion of the court, in which ANDY D. BENNETT and KRISTI M. DAVIS, JJ., joined.

Claire Adele Zanger, White House, Tennessee, for the appellant, Ashley A.[1]

Jonathan Skrmetti, Attorney General and Reporter, and Alison Elizabeth Potterfield, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

Erin A. Stubbs, Gallatin, Tennessee, Guardian Ad Litem for Othella S.

## OPINION

### I. Background

_____

[1] In cases involving minor children, it is the policy of this Court to redact the parties' names to protect their identities.

The minor child at issue in this case, Othella S. (the "Child"), was born in September of 2020. Ashley A. ("Mother," or "Appellant") is the Child's biological mother. Thomas K. ("Father") is the Child's putative father.[2] Appellee, Tennessee Department of Children's Services ("DCS"), first became involved in 2021, when it received a referral, alleging that the Child was exposed to drugs.

## A. Initial DCS Contact

On October 22, 2021, Case Manager Kaelyn Barker ("CM Barker") made contact with Appellant and the Child. During CM Barker's conversation with Appellant, she reported that she has used THC but refused a drug screen. Appellant and the Child were living with an uncle, who denied having any concern for the safety of the Child or the Mother.

On October 25, 2021, DCS filed a petition for dependency and neglect in the Juvenile Court for Sumner County ("trial court"). Therein, DCS alleged, *inter alia,* that "[M]other leaves and will be gone for weeks or months at a time" and "will stay with people that use meth and drink daily." The petition also asserted that Appellant had been missing since September 17, 2021, and that she "has fallen asleep and woke[n] up and the baby was missing and then when found had marks on her."

The petition alleged that CM Barker and law enforcement observed that Appellant was "severely underweight with bags under her eyes" and that "[t]here were marks on her arms and legs (including bruises and scratches)." DCS asked the trial court to order Appellant to complete a hair follicle test, complete an alcohol and drug assessment, and submit to random drug screens. The trial court entered an order granting DCS' petition on December 1, 2021.

## B. Removal of Child from Appellant's Custody

Although DCS' initial petition did not request custody of the Child, on February 28, 2022, DCS filed an amended petition seeking physical custody. The amended petition alleged that the Appellant had not maintained contact with DCS to schedule the hair follicle test as ordered by the court. DCS' averred that its last contact with Mother was in November 22, 2021, prior to the filing of the amended petition. The amended petition further alleged that Mother had not been cooperative or communicative with DCS for several months and, based on the immediate, specific, physical threat of harm to the Child, it was in her best interest to be removed to DCS custody.

---

[2] Thomas K.'s parental rights were terminated in the same order terminating Appellant's parental rights. Thomas K. is not a party to this appeal.

On February 28, 2022, the trial court issued an ex parte protective custody order, wherein it found that the Child was "subject to an immediate threat of harm to her health or safety" and that "no less drastic alternative" other than removal from Appellant's custody would "adequately protect the child's health and safety pending a hearing."

Before the trial court's February 28th order could be effectuated, Appellant fled the state with the Child. However, on March 1, 2022, Appellant was located and arrested in Kentucky. At that time, the Child was with her, and Appellant had methamphetamines on her person. As a result, the Child entered DCS' physical custody. The Child was placed with a foster family, where she has remained since that time.

On March 2, 2022, the Child's maternal grandparents filed a motion to intervene and petition seeking custody of the Child. On March 4, 2022, the trial court ordered the Child undergo a hair follicle test and ordered that she remain in the temporary custody of DCS. The trial court dismissed the grandparents' petition on May 9, 2022, for failure to prosecute. As discussed below, the Child's hair follicle test showed positive for methamphetamine.

### C. Trial Court's Finding of Dependency and Neglect

Following an adjudicatory hearing on January 4, 2023, the trial court entered an order on January 11, 2023. The trial court found, by clear and convincing evidence that the Child is a dependent and neglected pursuant to Tennessee Code Annotated sections 37-1-102(b)(13)(C) and (F) because of "Mother's daily drug use and the fact she regularly parented the [C]hild while actively under the influence of methamphetamine." The trial court also found the Child to be dependent and neglected pursuant to Tennessee Code Annotated section 37-1-102(b)(13)(D) based on testimony that the Child "had an obvious and immediate medical need due to the [C]hild's lack of muscle tone and emotional regulation issues which should have prompted a lay person to seek medical intervention." Furthermore, the trial court noted that, despite being approximately 18 months old, the Child was unable to crawl or walk at the time she was brought into DCS' custody. Moreover, the trial court found the Child to be dependent and neglected pursuant to Tennessee Code Annotated section 37-1-102(b)(13)(G) because Appellant never participated in any of the drug treatment services offered, was "arrested with drugs on her person [in Kentucky]" and following hair follicle testing, "the [C]hild was ultimately found to test positive for those same drugs, namely, methamphetamine." Accordingly, the trial court found that the Child was severely abused as defined in Tennessee Code Annotated section 37-1-102(B)(27)(F)(iii).

### D. Termination Proceedings

On February 17, 2023, DCS filed a petition to terminate Appellant's parental rights. After a series of changes to Appellant's counsel, and a brief delay to determine whether

the Child was a member of the Oglala Sioux Tribe, the case was set for trial on May 29, 2024. Thereafter, more delays occurred due to changes in Appellant's counsel, as well as pre-trial motions. The trial eventually took place on March 14, 2025, and May 30, 2025.[3] By order of August 8, 2025, the trial court terminated Appellant's parental rights on the grounds alleged in DCS' petition and on its finding that termination of Appellant's parental rights was in the Child's best interest. Appellant appeals.

## II. Issues

There are two dispositive issues:

I. Whether there is clear and convincing evidence to support at least one of the grounds relied upon by the trial court to terminate Appellant's parental rights.

II. If so, whether there is clear and convincing evidence to support the trial court's finding that termination of Appellant's parental rights is in the Child's best interest.

## III. Standard of Review

It is well-settled that:

A parent's right to the care and custody of [his or] her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clause of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors. . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745 (1982); *In re Angela E.*, 303 S.W.3d at 250.

*In re Carrington H.*, 483 S.W.3d 507, 521-22 (Tenn. 2016) (footnote omitted).

---

[3] Following the first day of trial, Appellant's then-counsel, Ms. Sorrells, filed a motion to withdraw as counsel on April 16, 2025, which the trial court granted on April 25, 2025. Appellant retained private counsel, Ms. Sankar, who filed a notice of appearance. The trial court held that Appellant "waived any issues on appeal related to the late substitution of counsel, as it was done at [Appellant's] request."

- 4 -

Termination of parental rights proceedings are governed by statute in Tennessee, ***In re Kaliyah S.***, 455 S.W.3d 533, 541 (Tenn. 2015), and the statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." ***In re Jacobe M.J.***, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting ***In re W.B.***, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g))) (internal quotation marks omitted).

Tennessee Code Annotated section 36-1-113 governs the termination of parental rights.  It provides, in pertinent part:

© Termination of parental or guardianship rights must be based upon:

(2) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) That termination of the parent's or guardian's rights is in the best interests of the child.

Tenn. Code Ann. § 36-1-113©.  Therefore, every termination of parental rights case requires the trial court "to determine whether the parent has engaged in a course of action or inaction that constitutes one of the statutory grounds for termination[,]" and whether termination of the parent's rights is in the child's best interest.  ***In re Donna E.W.***, No. M2013-02856-COA-R3-PT, 2014 WL 2918107, at *2 (Tenn. Ct. App. June 24, 2014). "Because the stakes are so profoundly high[ ]" in a termination of parental rights case, the statute "requires persons seeking to terminate a . . . parent's parental rights to prove the statutory grounds for termination by clear and convincing evidence." ***In re Audrey S.***, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005).  This Court has observed that "[t]his heightened burden of proof minimizes the risk of erroneous decisions." ***Id.***  (citations omitted).

If the trial court determines that clear and convincing evidence supports grounds for termination in light of its factual findings, the court "should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest." ***In re Kaliyah S.***, 455 S.W.3d at 555.  The party petitioning for the termination of parental rights bears the burden of demonstrating that termination is in the best interest of the child by clear and convincing evidence.  ***In re Angela E.***, 303 S.W.3d 240, 250 (Tenn. 2010).

We review the trial court's findings of fact *de novo* on the record with a presumption of correctness. Tenn. R. App. P. 3; ***In re Carrington H.***, 483 S.W.3d at 524 (citations

- 5 -

omitted). However, "[i]n light of the heightened burden of proof in termination proceedings . . . [we] must make [our] own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *Id.* at 524 (citation omitted). A trial court's conclusion that clear and convincing evidence supports termination of parental rights is a conclusion of law that we review *de novo* with no presumption of correctness. *Id.* (citation omitted). "This standard of review is consistent with the standard of review for mixed questions of law and fact." *In re Taylor B.W.*, 397 S.W.3d at 112-113 (citing *Starr v. Hill,* 353 S.W.3d 478, 481-82 (Tenn. 2011) ("Although a presumption of correctness attaches to the trial court's findings of fact, we are not bound by the trial court's determination of the legal effect of its factual findings[.]").

## IV. Grounds for Termination of Appellant's Parental Rights

The trial court terminated Appellant's parental rights on the grounds of severe child abuse, Tenn. Code Ann. § 36-1-113(g)(4), and failure to manifest an ability and willingness to assume custody, Tenn. Code Ann. § 36-1-113(g)(14). Although only one ground must be proven by clear and convincing evidence, the Tennessee Supreme Court has held that "appellate courts must review a trial court's findings regarding all grounds for termination and whether termination is in a child's best interests, even if a parent fails to challenge these findings on appeal." *In re Carrington H.*, 483 S.W.3d at 511. Accordingly, we will review the trial court's findings as to both grounds.

### A. Severe Child Abuse

The trial court terminated Appellant's parental rights based on Appellant's commission of severe child abuse pursuant to Tennessee Code Annotated sections 36-1-113(g)(4) and 37-1-102(b)(27).[4] At the time the petition was filed, Tennessee Code Annotated section 36-1-113(g)(4) provided a ground for termination of parental rights when "[t]he parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child." Tenn. Code Ann. § 36-1-113(g)(4).

As relevant here, at the time the petition was filed, Tennessee Code section 37-1-102(b)(27) defined "severe child abuse" to include "[k]- 6 -nowingly or with gross negligence allowing a child under eight (8) years of age to ingest an illegal substance or a controlled substance that results in the child testing positive on a drug screen, except as legally prescribed to the child," as well as "[k]- 6 -nowingly allowing a child to be within

---

[4] The current version of the statute includes the definition for severe child abuse at Tenn. Code Ann. § 37-1-102(b)(28). However, at the time of the hearing, the versions of the statute in effect defined severe child abuse at § 37-1-102(b)(27).

a structure where" methamphetamine, among other controlled substances "are present and accessible to the child[.]" Tenn. Code Ann. § 37-1-102(b)(27)(E), (F)(iii).

Citing the January 11, 2023 dependency and neglect adjudicatory order, the trial court found that Appellant committed severe child abuse because she was "arrested in Kentucky with methamphetamine on her person while Minor Child was present." Again, relying on the January 11, 2023 dependency and neglect adjudicatory order, the trial court found that the Child also tested positive for methamphetamine. In finding that these determinations were res judicata on the question of severe child abuse, the trial court noted that Appellant did no appeal or otherwise seek relief from the final dependency and neglect order.

On appeal, Appellant asserts that the trial court's determination that the January 11, 2023 order was res judicata on the issue of severe child abuse was error because the question of severe child abuse "was not addressed in the instant case by witnesses for the Department, nor on the Department's cross-examination of [Appellant]." Thus, Appellant asks this Court "to make a finding of first impression: that a finding of severe child abuse at the adjudicatory phase of a dependency and neglect petition, does not amount to de facto termination of a parent's rights, as appears to be the [trial court's] ruling in the case at bar." She further argues that "[t]he statute also requires a finding of severe child abuse using the standards of 'knowing' or 'gross negligence,'" but the January 11, 2023 order made no such finding.

Although Appellant argues that the trial court's reliance on the finding of severe child abuse at the dependency and neglect stage amounted to a "de facto termination of [her] parent[al] rights[,]" we disagree. To the contrary, in its January 11, 2023 order, the trial court clearly based its finding of severe child abuse on two underlying circumstances (the Child in proximity to methamphetamine and the Child testing positive for methamphetamine).

As we have previously held, "under the doctrine of res judicata, . . . a final order containing a finding of abuse cannot be attacked in subsequent actions." *In re William C.*, No. M2023-006460COA-R3-PT, 2024 WL 1665737, at *5 (Tenn. Ct. App. Apr. 18, 2024) (citing *In re Heaven L.F.*, 311 S.W.3d 435, 439 (Tenn. Ct. App. 2010); *State Dept. of Human Serv. v. Tate*, No. 01-A-01-9409-CV-00444, 1995 WL 138858, at *5 (Tenn. Ct. App. Mar. 31, 1995)). As we have explained,

> [t]he doctrine of res judicata applies when "an existing final judgment rendered upon the merits, without fraud or collusion, by a court of competent jurisdiction, is conclusive of rights, questions and facts in issue as to the parties and their privies, in all other actions in the same or any other judicial tribunal of concurrent jurisdiction."

***In re Heaven L.F.***, 311 S.W.3d at 439 (quoting ***Galbreath v. Harris***, 811 S.W.2d 88, 90 (Tenn. Ct. App. 1990). Accordingly, Appellant's attempts to attack the January 11, 2023 order at this stage of the proceedings is futile, and her failure to file a timely appeal of that order is dispositive on the question of its res judicata effect. As discussed above, Appellant's parental rights may be terminated pursuant to Tenn. Code Ann. § 36-1-113(g)(4) if, "under any prior order of a court," the parent has been found to have committed severe child abuse. In the trial court's January 11, 2023 order adjudicating the Child to be dependent and neglected, the court found that Appellant committed severe child abuse as defined in Tennessee Code Annotated section 37-1-102(b)(27)(F)(iii). Appellant did not appeal the trial court's finding, and, as such, it became a final judgment and res judicata on the question of severe child abuse. Consequently, the trial court did not err in terminating Appellant's parental rights on this ground.

**B. Failure to Manifest an Ability and Willingness to Assume Custody**

The trial court found that Appellant failed to manifest an ability and willingness to assume custody or financial responsibility for the Child under Tennessee Code Annotated section 36-1-113(g)(14) and that placing the Child in Appellant's care would pose a substantial risk of harm.

Tennessee Code Annotated section 36-1-113(g)(14) provides a ground for termination of parental rights when:

> [a] parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g)(14).

This ground for termination of parental rights requires the movant to establish two elements by clear and convincing evidence. ***In re Maya R.***, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018) (citation omitted). Concerning the first element, DCS has the burden to prove that Appellant failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the Child. Tenn. Code Ann. § 36-1-113(g)(14). The Tennessee Supreme Court has adopted the interpretation of section 36-1-113(g)(14) set out in ***In re Amynn K.***, No. E2017-11866-COA-R3-PT, 2018 WL 3058280 (Tenn. Ct. App. June 20, 2018); *see **In re Neveah M.***, 614 S.W.3d 659, 677 (Tenn. 2020) (citing ***In re Amynn K.***, 2018 WL 3058280, at *14). The interpretation adopted by our Supreme Court places a conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal custody or financial responsibility for the child. If a party seeking to terminate

parental rights proves by clear and convincing evidence that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is satisfied. *In re Neveah M.*, 614 S.W.3d at 677. If the first element is met, then DCS must additionally show that placing the Child in Appellant's custody poses "a risk of substantial harm to the physical or psychological welfare of the child." Tenn. Code Ann. § 36-1-113(g)(14).

Concerning whether Appellant manifested a willingness or ability to assume custody, the trial court found that Appellant: (1) has a substance abuse problem; (2) has never requested visitation with the Child; (3) has accrued additional criminal charges during the custodial episode; (4) was living in a sober home that does not allow children to reside there; and (5) does not have gainful employment. Based on these facts, the trial court summarized that:

> [Appellant] has a significant history of substance abuse and relapses. She is currently living in a sober living home and has recently found some success in her sobriety. She testified that she has been sober for approximately six (6) months. She has expressed a desire to assume custody[] but is not actually in a position to do so. The sober living home does not allow children to reside there. Based on her probation violation, she is court ordered to remain in this home until December 2025.

> Based on the foregoing, the Court finds that [Appellant] has failed to manifest an ability and willingness to assume custody of the child satisfying the first prong of the analysis.

The trial court's findings are supported by the evidence. As to Appellant's drug abuse issues, the record is replete with evidence supporting the trial court's findings. From the start of DCS' involvement with the Child, CM Barker and law enforcement noted concerns that Appellant was using illegal substances based on her appearance and behavior. Additionally, the circumstances that led DCS to seek custody of the Child included allegations that Appellant would leave for weeks or months at a time or would interact with known methamphetamine users. The evidence indicates that there were times where Appellant would lose track of the Child's whereabouts, including at least one occasion when she "had fallen asleep and woke[n] up and the baby was missing, and then when found had marks on her." Finally, the Child tested positive for methamphetamine.

When Appellant and the Child were located, in Kentucky, on March 1, 2022, and the Child entered DCS custody, Appellant was arrested and incarcerated. Subsequently, Appellant entered Buffalo Valley treatment facility for drug and alcohol abuse. Concerning Appellant's addiction issues, Family Services Worker Riggins ("FSW" Riggins), who was assigned to this case until July of 2024, testified, in relevant part, as follows:

Q: Ms. Riggins, can you tell me the circumstances, to your knowledge, of

- 9 -

when the mother left – did you say Buffalo Valley?

A: Uh-huh.

Q: -- Buffalo Valley treatment center?

A: So she left there – it would have been shortly into May or June [of 2022].

Q: And do you recall if that was – if she had completed that program?

A: She did complete it, yes.

Q: And as part of your case, did you speak to the mother through the duration of her time at that ranch?

A: Yes.

Q: Do you recall what some of the recommendations were upon her completing that program?

A: So they provide like, a biopsychosocial assessment; regular, like group therapy; individual therapy and medication management while there. And typically it's, like, a 30-day program, 28 to 30 days. From there, she was discharged to complete either [partial hospitalization program (PHP)] or [intensive outpatient program (IOP)] with Evolve in Knoxville.

***

Q: And do you recall the circumstances of that discharge from Evolve?

A: So, obviously she only stayed in Knoxville for, like, a week and then worked on treatment in Lebanon. She did not complete that whole treatment, which was – I can't recall the certain circumstances that led to leaving there, but later she did complete IOP with another provider.

Q: Did you ever, throughout the case, receive any indication that she had failed to complete the program at Evolve?

A: Yes. Yes.

Q: But you don't recall the circumstances of why she failed to complete it?

A: No.

- 10 -

Then, on July 28, 2022, FSW Riggins conducted a mouth swab of Appellant to test for drug use. Concerning the results of that test, FSW Riggins testified:

Q: And what was the first date of that mouth swab?

A: July 28th, 2022.

Q: And what were the results of that mouth swab?

A: She was positive for marijuana.

Q: I know that you mentioned that the mother had been in treatment around that time, correct?

A: Yes.

Q: Do you recall what the treatment circumstances were at the time of that screen?

A: So at that point she had completed Buffalo Valley and had been at Evolve, and then after leaving Evolve in May or June, this was completed in July.

***

Q: Are you concerned that the mother is still testing positive for marijuana subsequent to a treatment facility?

A: Yes. It's a concern in regards to needing her to maintain sobriety to work a permanency plan.

Q: And is it fair to say that marijuana – I don't want to say "just marijuana," but marijuana would still be a concern if she was using that, correct?

A: Yes. For someone that has struggled with any type of substance use, it's a mind-altering substance, whether it's less in society's eyes, I will say.

On October 17, 2022, Appellant submitted to another mouth swab test. FSW Riggins testified that the results of that test were positive for methamphetamine and amphetamine. FSW Riggins further testified, and the submitted permanency plans show, that, in July of 2023, Appellant completed an alcohol and drug] assessment, and twenty sessions of IOP. FSW Riggins noted that, at that time, Appellant was employed and relatively stable. In December of 2023, FSW Riggins noted, in her updates to the

- 11 -

permanency plan, that Appellant had "worked to improve parenting skills through a parenting assessment and recommendations," and had "completed necessary tasks to maintain compliance with DCS." At that point, she was also "reported [as being] eager to rebuild her relationship with her daughter" and "searching for full-time employment in Sumner County[.]"

Then, on March 28, 2024, DCS conducted another mouth swab test, and Appellant tested positive for methamphetamine and amphetamine. FSW Riggins testified:

Q: And in your opinion has the mother failed – biological mother failed to make any sort of lasting changes in her circumstances?

A: I mean, I guess kind of clarify like –

Q: So you provided testimony that the mother has had continuous relapses through the duration of your case, correct?

A: Yes.

Q: Do you have anything to suggest that she's had a significant, long-time absence of some sort of drug use?

A: No.

\*\*\*

Q: You provided testimony today that the mother has completed the A and D assessments after her relapses, correct?

A: Yes.

Q: Has the mother – at least for three of those relapses, did she, in your opinion, actively take advantage of all the resources that could have been available to her at that time in terms of treatment?

A: Yes, especially while I've been – while I was on the case, yes.

Q: So after the THC drug screen, did she enroll in an inpatient program?

A: Not for that, no.

Q: After the subsequent screen which was positive for methamphetamine, did she enroll in an inpatient treatment program?

- 12 -

A: No. That was just an A and D assessment, as well as the third time.

Q: And then the third failed drug screen, did she enroll in an inpatient treatment program?

A: No.

In addition to her continuing struggles with drug abuse, according to FSW Riggins' testimony, Appellant has not been consistent in visiting the Child, to-wit:

Q: [to FWS Riggins] The child has been in custody how long, did you say?

A: Physically since March 1st, 2022, but legally, February 8th.

Q: So going on three years?

A: Yes.

Q: Has the child had any sort of visitation or seen the mother in that timeframe?

A: We had one Pre-K assessment where the foster mom was – we was [sic] looking at possibly getting services within the Sumner County Schools. Mom did participate in that and was able to visit.

Q: What date would that have been?

A: That was September or October of 2024.

∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎

Q: Throughout the duration of your case – so two years, you could say, you had the case – did the mother ever file anything in court asking to be a part of [appointments for evaluations, services, or other meetings] or to have the ability to go and take the child to appointments or be at the child's appointments?

A: She had requested visitation pretty often with her previous counsel.

Q: Were you there present when she was talking to her counsel?

A: No. But there was one time in particular that I had reached out to her counsel, saying, hey, she's wanting visitation.

Q: My original question was had she ever filed anything for it?

A: Not to my knowledge.

Q: So through the duration of the case and the Juvenile Court record was there ever a motion for visitation or a motion to attend any of the appointments you were talking about?

A: No, not until recently. She had a court hearing that I wasn't present for regarding visitation.

The motion Ms. Riggins refers to in her testimony was denied by the trial court at the outset of the hearing on DCS' petition to terminate Appellant's parental rights. In sum, during the entire custodial episode, Appellant has visited the Child one time.

In addition to continuing drug use, the evidence shows that, during the custodial episode, Appellant was detained for assault. FSW Riggins testified:

Q: Okay. So through the duration of your case, was she on probation?

A: Yes. Some of it, yes.

Q: Do you recall any sort of violations or concerns with her probation?

A: I know she briefly went to Sumner County Jail for an assault and was worried about probation violation at that point.

Q: Are you aware if the violation occurred based off of that assault?

A: I can't recall on that.

As to her parole violations, Appellant testified as follows:

Q: Have you seen this document [Exhibit 23, copies of Appellant's Allen County, Kentucky Criminal Records] before?

A: It looks similar to the cell I was in, incarcerated in Kentucky, but its not exactly the same.

Q: It indicates your current violations, right?

A: Uh-huh.

Q: What are the highlighted violations?

A: Possession, possession – what? Possession of controlled substances?

Q: Methamphetamine.

A: For a violation?

Q: Uh-huh. And what was the next one?

A: Failure to report to parole officer as directed, failure to cooperate with parole officer, use of controlled substances.

Q: They found probable cause and detained you for a period of time, right?

A: Yes.

Q: They detained you in jail. And then on November 26th, 2024, defendant stipulates to using illegal drugs and failing to report, right?

A: I had to, but I didn't fail to report ever.

Q: But you stipulated in a court of law that you did fail to report, right?

A: I had to, yes.

In addition to the foregoing parole violations, Appellant has failed to obtain stable housing during the time the Child has been removed from her custody. According to the testimony, for a period of time after the Child's removal, Appellant lived with a paramour. FSW Riggins expressed concerns due to the paramour's prior drug use.

After being detained in December of 2024, Appellant was discharged to Doors of Hope, a sober living home. However, children cannot not reside in the facility, and Appellant "anticipate[d] being there for 12 months" based on a court order. Appellant testified that her plan, should she be able to regain custody of the Child, was as follows:

Q: And I know you've still got a while at Doors of Hope, when the time comes that you complete and are discharged from that program, where are you intending to live? I know you've said that your environment and the people around you are a trigger for you. What are your plans or the plans that you've developed within your program to keep you from having these issues in the future?

A: Well, I'm definitely not going to go back near my hometown. I would like to stay in the Murfreesboro area where I'm at. It's got a very strong community of recovery. I have options. I mean I would potentially like to be able to afford my own place, hopefully, for if the time comes that I can have [the Child], a two bedroom for us. And I do have a lot of resources, like Tennessee Voices is my advocate. They will help me get started. They have, like, housing and stuff. They would help me pay for that. They're providing me with a car, paying my license off. If I can't for some reason make that happen – I do foresee me being able to get my own place in the area of Murfreesboro, but there are always mother and children homes all over the place that I could potentially go to. It's not ideal for me, but it wouldn't be so bad because there's kids to play with and stuff, but there are a lot of options. It's something I'll think about a little bit, because I just started working, but my plan is to move up there, too, and so I can get a little more income and stuff, and I've been saving money.

Although Mother's aspirations for future stability are commendable, our inquiry centers on her present ability to assume custody.

As to Appellant's employment, at the outset of the case, she reported working at 7-Eleven. Appellant then worked at Starstruck Farm, followed by ABC Technologies, followed by a period of unemployment. At the time of the termination hearing, Appellant testified:

Q: Where are you working?

A: Right now, I'm working at McDonald's.

Q: And what is your rate of pay there?

A: It's, I think, almost $14 an hour.

Q: How many hours a week do you typically work?

A: About 40.

Appellant then testified she made a approximately $891.54 bi-weekly, and she had just started paying $600 in rent at the Doors of Hope living facility. She testified that she had no transportation and no license.

From the foregoing testimony, Appellant's ability and willingness to assume custody of this Child clearly have been hindered by her continuing drug use and the

- 16 -

instability caused by her addiction. At the time of the hearing to terminate her parental rights, Appellant was unable to care for the Child. Her own testimony supports this conclusion, to-wit:

> Q [to Appellant]: Is it your position today that you're capable today to take custody of your child?
>
> A: I wouldn't be able to take her right now, no.
>
> Q: And you are aware this has been going on for some time. Is that fair?
>
> A: Yes, sir.

This testimony clearly shows that Appellant does not have the present ability to assume custody or care of the Child. *See In re Nevaeh B.*, No. E2019-01539-COA-R3-PT, 2020 WL 1527001, at *7 (Tenn. Ct. App. Mar. 31, 2020). "When analyzing a parent's ability to assume custody, we focus on his or her 'lifestyle and circumstances.'" *In re Jonathan M.*, No. E2018-00484-COA-R3-PT, 2018 WL 5310750, at *5 (Tenn. Ct. App. Oct. 26, 2018)). Her unresolved addiction issues, lack of involvement in the Child's life, parole violations, unstable housing, lack of transportation, and spotty employment history provide ample evidence to clearly and convincingly support the trial court's conclusion that Appellant has failed to manifest an ability or willingness to assume custody of the Child. *In re Nevaeh B.*, 2020 WL 1527001, at *7 (finding father had not established an ability to assume custody based on positive drug screens, probation violations, additional criminal charges brought during period of DCS custody, and failure to visit or support children during the custodial period); *see also In re Maya R., et al*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018) (finding mother did not have an ability to assume custody due to "itinerant lifestyle" and unstable housing).

As to the second prong of this ground, *i.e.*, risk of substantial harm, the trial court found that Appellant "is a stranger to" the Child, noting that she does not recognize or know Appellant. Additionally, the trial court correctly noted that Appellant has not rectified the drug exposure concerns that led to the Child's removal.

As discussed further below, the Child has medical and developmental needs that require special care, regular appointments, and therapies. Appellant has no transportation, no license, and unstable employment. Furthermore, Appellant has no stable housing. Despite her undefined plans to obtain adequate housing, the record shows that, up to the date of the hearing, she has been unable to do so. The Child needs stability, and, at present, Appellant can offer none.

Finally, as discussed further below, the Child has no parental bond with Appellant. Rather, she has bonded with her foster family, which is the only family she has known. In

this regard, placing the Child in Appellant's custody would likely cause significant psychological harm. Accordingly, there is clear and convincing evidence to support the trial court's findings as to both prongs of this ground for termination of Appellant's parental rights.

## V. Best Interest

Tennessee Code Annotated section 36-1-113(i)(1) contains a non-exclusive list of factors applicable to the court's best-interests analysis. The statute provides:

(i)(1) In determining whether termination of parental or guardianship rights is in the best interest of the child, the court shall consider all relevant and child-centered factors applicable to the particular case before the court.

At the time of the filing of the petition to terminate Appellant's parental rights, those factors included, but were not limited to, the following:

(T) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

® Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

® Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(T) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

® Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

The statutory factors are not exclusive but "illustrative . . . and any party to the termination proceeding is free to offer any other factor relevant to the best[-]interests analysis." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017) (citation omitted). Whether termination is in the child's best interest must be "'viewed from the child's, rather than the parent's, perspective.'" *Id.* (quoting *In re Audrey S.*, 182 S.W.3d at 878). "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child[.]" *Id.* at 681, 682 (quoting Tenn. Code Ann. § 36-1-101(d) (2017)). The court's "'focus on the perspective of the child is the common theme' evident in all of the statutory factors." *In re Neveah M.*, 614 S.W.3d at 679 (Tenn. 2020) (quoting *In re Audrey S.*, 182 S.W.3d at 878).

The trial court's factual findings relevant to the best-interest analysis must be supported by a preponderance of the evidence. *In re Kaliyah S.*, 455 S.W.3d at 555 (citation omitted). Additionally, the court must determine whether the combined weight of the facts amounts to clear and convincing evidence that termination of parental rights is in the child's best interest. *Id.* (citation omitted). As noted above, we review the trial court's best-interest analysis under the standard of review applicable to mixed questions of fact and law. *In re Taylor B.W.*, 397 S.W.3d at 112-113. We will affirm the trial court's factual findings unless they are unsupported by a preponderance of the evidence. *In re Neveah M.*, 614 S.W.3d at 674 (citations omitted). Whether the court's factual findings amount to clear and convincing evidence that termination of parental rights is in the child's best interest is a question of law that we review *de novo* with no presumption of correctness. *Id.* (citations omitted).

Turning to the final order in this case, the trial court considered the relevant statutory factors and made specific findings, which we review below:[5]

---

[5] The trial court found that there was no evidence concerning the following factors: "[w]hether the child is fearful of living in the parent's home"; "[w]hether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms"; and "[w]hether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult[.]" "Tenn. Code Ann. §§ 36-1-113(i)(F), (G), (N). We agree that there is no evidence as to these factors, and that the trial court did not err in excluding them in reaching its decision.

- 20 -

## A. Tennessee Code Annotated Section 36-1-113(i)(1)(A)

As to the effect termination will have on the Child's need for stability through her minority, the trial court found that "termination of . . . [Appellant's] . . . parental rights will promote the Minor Child's critical need for stability and continuity of placement." It determined that the foster family "provided for [the Child] and all of her specialized care without any hesitation."[6] The trial court summarized that "[t]he cumulative testimony of each of the DCS employees who have witnessed this [C]hild with her foster parents was consistent that Minor Child is strongly bonded with the [foster family]; [they] meet all of her needs, and that Minor Child views her foster family as her own family."

The record supports the trial court's findings. The Child was removed from Mother's custody when she was eighteen months old. At the time of the hearing, the Child was more than four years old. She has been with the same foster family since her placement, and the foster mother and father both testified that they want to adopt the Child.

## B. Tennessee Code Annotated Section 36-1-113(i)(1)(B)

As to the effect a change in caretaker or environment will have on the Child, the trial court reviewed the specialized care that the Child requires. The trial court noted the "over 600 medical and service[-]related appointments since she has been placed" in foster parents' home. The trial court found that the Child "appears to be flourishing in her foster home" and that she "has bonded with her foster family and [is] loved by them and their extended family." The trial court held that this factor not only weighs in favor of termination, but it is "outcome determinative."

The foster mother testified concerning the Child's medical and developmental needs as follows:

> Q: . . . [W]hat kind of specific needs [does the Child have] . . . that you've been overseeing and providing her since she's been in your home?
>
> A: You mean like therapies and diagnoses?
>
> Q: Uh-huh.
>
> A: So she has -- she came to us with global developmental delays, fine motor, gross motor, speech, cognitive. She has hypotonia, which is like muscle weakness, low muscle tone. She came to us with feeding issues, emotional and self-regulation concerns, a lot of behavior issues. So currently we have

---

[6] The "specialized care" required for the Child is discussed in more detail below.

her in physical therapy every week, occupational therapy, TEIS, early intervention. She sees developmental medicine at Vanderbilt. Things that she has graduated from are neurology, speech, feeding therapy. Play therapy, like I said, we did for just under a year.

Q. So based on those graduations, what specific special needs and what services or therapies is she receiving on today's date?

A. So today she sees weekly physical therapy, biweekly occupational therapy, weekly TEIS, early intervention, developmental medicine every six months.

When DCS was unable to find play therapy close to the foster family, they paid out-of-pocket and drove the Child more than an hour every week to receive play therapy. Testimony from FSW Riggins clarified that, until the hearing took place, Mother never requested to participate in any of the Child's appointments other than Pre-K assessment. When asked whether she had the ability to take the Child to all necessary appointments, Appellant candidly testified that she would not be able to "at this moment" but hoped to be able to in the future. Although Mother's intentions are good, she is not currently able to provide for the Child's needs, whereas the foster family has demonstrated the ability and willingness to do so. This factor weighs in favor of termination of Appellant's parental rights.

### C. Tennessee Code Annotated Section 36-1-113(i)(1)(C)

As to Appellant's continuity and stability in meeting the Child's material, educational, housing, and safety needs, the trial court found this factor weighs in favor of termination. The court trial noted that Appellant had only been sober three months of the eighteen months that the Child was in her custody. Otherwise, (1) Appellant "actively cared for the Minor Child while under the influence"; (2) Appellant was found by law enforcement, who observed that the Child had obvious and immediate medical needs that would have prompted a lay person to seek intervention; and (3) due to her active addiction, Appellant either failed to recognize those needs or failed to act on them. The trial court concluded that Appellant "stands in the same position in 2025 that she did in 2022." We agree.

As discussed above, there is ample evidence that Appellant's addiction continues to interfere with her ability to care for the Child's basic safety needs. Under Appellant's care and supervision, the Child tested positive for methamphetamine. Additionally, at the time of the hearing, Appellant's plans for stable housing were not concrete. Rather, as set out in context above, Appellant testified that she "would potentially be able to afford [her] own place," but that her alternative solution would be a group home for mothers and children. Finally, as to Appellant's ability to meet the Child's material needs, the record shows that,

although she currently works at McDonald's, where her bi-weekly income is less than nine hundred dollars, her ability to maintain employment long-term is not proven. For many of the reasons previously discussed, we conclude that the evidence supports the trial court's conclusion that Appellant cannot provide the necessary continuity or stability to meet the Child's needs. As such, this factor weighs in favor of termination of her parental rights.

### D. Tennessee Code Annotated Section 36-1-113(i)(1)(D)

The trial court found that there is no parental attachment between Appellant and the Child, and the record supports this finding. Appellant's own testimony established that the Child and Appellant "don't know each other at all" and that she has seen the Child only once since she came into DCS custody. The record shows that the Child has formed a strong parental bond with the foster parents, whom she refers to as "Mom" and "Dada." As such, this factor supports termination of Appellant's parental rights.

### E. Tennessee Code Annotated Section 36-1-113(i)(1)(E)

Concerning whether Appellant availed herself of regular visitation, the trial court found that, "[Appellant]/Mother has not engaged in visitations or had meaningful contact with Minor Child." The trial court noted that, prior to DCS filing its petition to terminate her parental rights, Appellant had sent only two emails to the foster parents to request an update on the Child. However, the fact remains that Appellant has seen the Child only once in nearly four years. Accordingly, the evidence supports the trial court's finding that this factor weighs in favor of termination of Appellant's parental rights.

### F. Tennessee Code Annotated Section 36-1-113(i)(1)(H), (I)

Regarding the Child's healthy parental attachment with another person and her emotionally significant relationships with others, the trial court made the following findings:

> Minor Child has demonstrated emotionally significant relationships with her foster siblings and the foster family's extended family. [The foster mother] testified credibly that [the Child] is very close to her foster sisters, who are close in age with [the Child]. She testified that they act as sisters and "best friends." . . . [The Child] considers the [foster parents'] parents to be her grandparents and is loved and accepted by them.

The trial court also noted important relationships with daycare staff and other families from the daycare facility that "have become an important support network both for the foster parents and for Minor Child."

Foster mother testified as follows regarding the Child's daycare:

- 23 -

Q: Okay. Is she in – what year is she in? Is she preschool? Daycare?

A: So she's in preschool at her daycare, and in August she'll move up to pre-K.

Q: And how long has she been at that daycare?

A: She's been there the entire time that she's been in school. I think maybe it was 2023 that she started, August of 2023.

Q: Does she enjoy it?

A: She does. She loves going. She has friends there that have been there the whole time. She has teachers, just consistent staff, consistent people. Her village. She's learning. She'll come home singing the songs that she's learned there, and she'll tell us about her day. She's always happy. Never cries or anything to drop off, always happy, and always happy to be picked up too.

Regarding extended family and friends, the foster mother testified as follows:

A: . . . We have a good support system. The kids – even though some of our family lives out of state, we try to do like three to five FaceTimes a week where the kids are talking to their cousins or they're talking to grandparents or uncles and aunts. We have a strong support base here, too, of friends, where we do like one family night a month. So it's four groups of us with a lot of little kids get together and just have family time with each other and communion. And it's great because that group of friends is so strong, and our kids go to the same schools and daycares, and we actually – our kids go to the same therapists. So if it's like, oh, I'm running late to therapy, can you pick up so and so from daycare, they can do that. So we just have a really strong support system that we all see regularly.

Q. Does [the Child] appear to be attached to the people in that support system?

A. Yes, she's very attached, whether it's her therapist, her teachers, her friends, our friends, her cousins, you know, the family. She is bonded and attached, and that's taken a long time because she came to us with some attachment issues and concerns. So she's worked through that, and it's great to see her blossom over time.

Q. Has [the Child] been a part of your extended family activities like holidays, things like that?

A. Yes, yes. I have, like I said, extended family in Michigan. So she takes the trips with us when we go back to see family or if they come here and visit holidays. And, like I said, we have -- we try to do three to five FaceTimes a week where she's running around with the phone and FaceTiming her cousins or grandparents just telling them about her life and stuff.

Q. Do they appear to view her as a member of the family?

A. They love [Child]. They love [Child].

Q. Does she appear to view them as her family?

A. She does.

The Child's foster father also testified as follows regarding his relationship with the Child and her relationship with the other children in the foster home:

Q. And as she has resided in your home, how has your relationship with her changed?

A. I'm kind of her go-to person. Especially at the beginning, I was definitely her go-to person. For what reason? I don't know. But she used to prefer me over Mom most of the time in the early days and over anybody else within our house. Now, when it came to outside of our house, she would kind of go to anybody at first, but then, you know, she just took to me for whatever reason. And, like I said, I carried her a lot during the first several months because she didn't want to do much walking on her own. And, yeah, that's . . .

Q. What does she call you?

A. Dada.

Q. Dada.

A. Just because her siblings call me that, so . . .

Q. Right. Have you ever prompted her to call you that?

A. No, she just took it from her siblings.

Q: Okay. Were [two older children] already in your home when [the Child] joined your home?

A: Yes.

Q: Okay. So those two girls have been there the entirety of the custodial episode?

A: Right.

Q: So she's spent 39 months residing with them?

A: Uh-huh.

Q: Do you believe that they're bonded?

A: Definitely, yeah.

The foregoing undisputed testimony supports the trial court's finding that the Child's attachments with her foster family and their extended circle are healthy and emotionally significant. Taking her from the current family would not be in the Child's best interest; as such, this factor weighs in favor of termination of Appellant's parental rights.

## G. Tennessee Code Annotated Section 36-1-113(i)(1)(J)

As to whether Appellant has demonstrated that she is able to make lasting adjustments such that the Child would be safe with her, the trial court first commended Appellant for her current efforts toward sobriety. However, the trial court went on to find that despite the "period of approximately six (6) months of treatment" prior to the hearing, Appellant had not "demonstrate[d] a lasting adjustment, as required by statute." Instead, she had "demonstrated the ability to be very successful in heavily monitored programs, including Drug Court, but she has not demonstrated that she can maintain that change on her own, out in the community." The evidence supports this conclusion.

Appellant's most stable periods of sobriety have been during times of incarceration or active participation in intensive drug rehabilitation programs. However, outside these settings, Appellant has relapsed. As noted above, she tested positive for illegal substances on all three drug tests administered by DCS during the custodial episode. Appellant has

also violated her parole. These facts are particularly troubling. Indeed, Appellant testified that she has particular "triggers" that affect her sobriety:

Q: Throughout your treatment, you mentioned that you're seeing four different – or three different groups at this time, at least therapists addressing some sort of either trauma or A and D assessment. Have you identified what your triggers are?

A: Oh, yeah.

Q: What are those?

A: Mainly people, places, and things, like certain people, certain areas. I don't particularly think it's a good idea for me to be in the Gallatin, Bethpage, Westmoreland area. Triggers like loss, like grief, things like that. You know, obviously, I don't go to bars, stuff like that. I don't – and then, obviously, like my trauma from the past, like I just mention the guy that – he was a distant cousin that used to molest me growing up. Obviously, those types of people and that trauma itself is what I'm addressing at Doors of Hope.

Like the trial court, we acknowledge Appellant's efforts to complete treatment for her drug addiction. However, at the time of the hearing, her ability to remain sober, while also working and maintaining a home, is unproven. This, coupled with the significant support the Child requires with appointments and therapies, supports the trial court's finding that Appellant has been unable to make lasting adjustments to keep the Child safe in her custody. This factor weighs in favor of termination of Appellant's parental rights.

**H. Tennessee Code Annotated Section 36-1-113(i)(1)(K)**

Regarding Appellant's actions to take advantage of available assistance programs, services, or resources, the trial court found that Appellant "has taken advantage of available programs," and the court heard testimony from several individuals who have worked with Appellant toward her goal of sobriety. The trial court applauded Appellant's current involvement and recovery actions but surmised that her recovery is not proven. Rather, the trial court noted that Appellant's "recovery actions seem to consistently coincide with an effort to thwart criminal prosecution or are part of a court mandate."

We agree with the trial court's finding. Although there was ample testimony that, at the time of the hearing, Appellant was actively seeking recovery, there was insufficient evidence to support a finding that her participation in programs, services, or community resources has resulted in lasting adjustments in her circumstances, conduct, or conditions. The Child was removed from Appellant's custody on March 1, 2022, and the first hearing regarding termination of Appellant's parental rights took place on March 14, 2025.

In those three years, Appellant failed four drug screenings – three conducted by DCS and one conducted by order of the Kentucky court. Although she was sober at the time of the hearing, Appellant was also enrolled (by order of the Kentucky court) in the heavily monitored program at Doors of Hope. In short, when not under court order or when not facing judicial consequences, Appellant has relapsed and has failed to avail herself of any benefits she may have gleaned from her time in court-ordered rehabilitation. In short, based on the record, the trial court's concern that Appellant is incapable of voluntarily participating in or taking advantage of programs that will assist her in making lasting adjustments is valid. Accordingly, we agree with the trial court that this factor weighs in favor of termination.

## I. Tennessee Code Annotated Section 36-1-113(i)(1)(L)

Regarding whether DCS has made reasonable efforts to assist Appellant in making lasting adjustments, the trial court found that Appellant waited more than one year from the beginning of DCS' involvement to even began to address the requirements outlined in the permanency plans. The trial court succinctly stated that "DCS cannot help the [Appellant] if the [Appellant is] unwilling to help [herself]." We agree.

. Prior to the Child being removed from Appellant's custody, DCS filed a petition for dependency and neglect on October 25, 2021. Although DCS did not seek custody of the Child at that time, it did request that Mother complete a hair follicle test, complete alcohol and drug assessment and follow all recommendations thereof. In addition, Mother was to submit to random drug screens. However, she "did not comply with CPS guidelines, services, court hearings/orders, which initiated the [guardian ad litem] to file [a] motion for [C]hild to enter state's custody."

It is undisputed that DCS offered services such as parenting classes, IOP sessions, drug screens, and psychological evaluation with individual therapy and that Appellant took advantage of some of those opportunities. It is also true that the permanency plans from November of 2022 to March of 2024 show progress towards compliance with the requirements outlined in those plans. However, Appellant still struggled to maintain sobriety, stable housing, and employment as evidenced by the positive drug screens, and her unstable housing and employment history. As such, the evidence supports the trial court's conclusion that DCS offered support to Appellant throughout the custodial period, but Appellant failed to avail herself of these opportunities to make lasting adjustments.

## J. Tennessee Code Annotated Section 36-1-113(i)(1)(M)

As to whether Appellant ever demonstrated a "sense of urgency in seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest[,]" the trial court found that Appellant's efforts in seeking treatment and visitation with the Child "while laudable, [were] 'too little,

too late.'" We agree.

Regarding Appellant's sense of urgency in seeking custody of the Child, we note that instead of addressing DCS' concerns when they were brought to her attention in early 2022, Appellant ignored her issues and chose to flee the state. Then, instead of working towards substantial compliance with the parenting plans at the outset of the custodial period, Appellant waited until the Child had been in DCS custody for a year before reaching the "substantial compliance" mark in the March 2023 permanency plan ratification. Even then, Appellant's relapses and continuing issues with maintaining stable housing and employment show a lack of urgency on Appellant's part in making the necessary changes to her lifestyle.

Appellant's lack of urgency is most apparent in that her first request for visitation with the Child came in May of 2023. Not only was that request made more than a year into the custodial period, but it was also made *after* the filing of the termination of parental rights petition. We note that Appellant testified that she "had no idea [she] could go to medical appointments," and further stated that she requested visitation "very often" through her counsel. However, there is no indication that Appellant sought visitation until after DCS filed the petition to terminate her parental rights. This factor weighs in favor of termination of Appellant's parental rights.

### K. Tennessee Code Annotated Section 36-1-113(i)(1)(O)

Regarding whether Appellant ever provided safe and stable care for the Child, the trial court noted that Appellant "has [n]ever provided safe and stable care for this [C]hild or any other child." The record includes evidence that, prior to this case, Appellant lost custody of two other biological children. On March 13, 2017, the Sumner County Juvenile Court entered an order finding Appellant's minor child, who was born in 2015, to be dependent and neglected and awarding custody to the child's father. The award of custody to the father was predicated, in large part, on Appellant driving with the infant while intoxicated and on Appellant's continued drug abuse.

On April 13, 2017, the Sumner County Circuit Court issued an order "terminat[ing]/abat[ing]" and "reserv[ing]" Appellant's "parenting privileges" to a minor child born in 2010. Mother's "privileges" were suspended pending "resolution of [her] pending criminal charge(s)" and Appellant's "filing a petition … seeking the reinstatement of her parenting privileges" accompanied by "verification through proof to the Court that her drug problem(s), both past and present, are no longer an issue." The circuit court found that "continuation of [Appellant's] parenting time . . . poses a substantial risk of irreparable harm to the child." That finding was based on Appellant's arrival at supervised visitation with methamphetamine and other drug paraphernalia on her person. The child's father was given exclusive custody of the child in the order. There is no indication that Appellant's parenting privileges to this child have been restored.

- 29 -

As discussed, *supra*, the Child at issue in this case was removed from Appellant's custody due to concerns over her welfare. The foster mother provided testimony regarding the Child's condition on arrival at the foster home:

A: So she has – she came to us with global developmental delays, fine motor, gross motor, speech, cognitive. She has hypotonia, which is like muscle weakness, low muscle tone. She came to us with feeding issues, emotional and self-regulation concerns, a lot of behavior issues.

\*\*\*

Q: And in the event the Court made the decision to dismiss the Department's petition and there was some sort of – if there was a restoration, the [M]other regained custody of [the Child], would you have concerns of her safety?

A: I would.

Q: And can you tell me why specifically you would have those concerns?

A: Because of how she came to us, because of what appears to be the instability of her over the last – over three years that she's been with us, meaning Mom's instability, the relapses. When I think of how she came to us not walking, not talking, not eating, terrified.

The foster father also testified as to the Child's condition on arrival:

Q: And what can you tell the Court about how [the Child] was when she first came to your home versus how she is now?

A: So the night she first came to us she was filthy, didn't say anything, just kind of stumbled around, wouldn't talk to anybody hardly. As the night went on, she kind of gravitated my way and kind of -- never like got in my lap or like touched me or anything, but just kind of stood close to me. And then the . . . older kids, they tried to interact with her, but she wasn't really having it as it started out. But as time has went on, you know, she's developed that relationship. You know, she definitely talks -- talks more now than she did when she first came to us. And she's got a pretty tight bond with [older child] and [other older child], and even the new kids that have came in our home we've fostered since then. And, yeah, I remember that first -- yeah, the first, in the beginning, you know, she didn't want much to do with anybody. She would always like -- as a few months went in, she would like start lifting her arms up to me for me to carry her. She wanted me to carry her everywhere, probably her first four or five months with us. And then we kind of had to

- 30 -

start forcing her to start trying to, you know, walk and do things on her own. And, you know, as she's went [sic] through some therapies and things, like she's definitely in a better place now than what she was.

Q. When you said she was filthy when she first arrived, what did you observe?

A. Just like the -- like she was just dirty. I don't really know how else to explain it.

Q. Was dirt visible on her person?

A. Uh-huh, yes.

Q. Was dirt visible on her clothes?

A. Yes, uh-huh.

Q. Did she smell bad?

A. Yes. I wasn't like that close to her at first. My wife kind of immediately took her to the bath because of that. And, you know, she spent some extensive time with her in the bath there at the beginning.

Based on the record, we agree with the trial court's conclusion that Appellant "has never provided safe and stable care for this child and arguable any of her other children." As such, this factor weighs in favor of termination.

## L. Tennessee Code Annotated Section 36-1-113(i)(1)(P), (Q)

In considering whether Appellant has demonstrated an understanding of the Child's basic and specific needs, the trial court concluded that because Appellant has not attended any of the Child's appointments since the beginning of the custodial episode, this factor weighs in favor of termination.

Like the trial court, we note the foster family's commitment to the Child's development. Not only have they taken her to basic therapies, but they have also sought out specialized therapies. Some of these specialized therapies have required the foster family to drive several hours; however, they have been more effective in treating the Child's issues than locally available therapies. From the foster mother's testimony, there have been over 600 appointments since the Child's placement in their home. These appointments have been in addition to the daily work and consistent schedule required to assist a Child in need of such developmental support.

- 31 -

From her testimony, Appellant is not completely oblivious to the Child's special needs, to-wit:

Q: Are you aware of any sort of specialized care that she requires?

A: Yes.

Q: What is that?

A: She goes to occupational therapy, play therapy. She had speech therapy, TEIS. She had leg braces at one point. She had feeding therapy. I'm probably missing something in there but that's the majority of it.

Although Appellant acknowledges the need for therapy, there is no indication that she is aware of the extent of the need. Regardless, we agree with the trial court's conclusion that Appellant has not "demonstrated the ability and commitment to creating and maintaining a home that meets the [C]hild's basic and specific needs in which the [C]hild can thrive."

The trial court reviewed the medical and developmental needs of the Child, as well as the extensive efforts the foster family has made to accommodate the Child's needs. The trial court addressed Appellant's lack of participation in the Child's appointments and lack of effort in obtaining visitation rights and found that her testimony that she did not know she could attend appointments was not credible. Instead, the trial court found her avoidance of the Child had more to do with her testimony that "it was hard for [her] to . . . see pictures of [the Child] and just hear her troubles[.]" The trial court further noted that Appellant "was already found responsible for neglecting this [C]hild's obvious medical needs" and that she does not have "any real understanding of this [C]hild's needs and the amount of work that has gone into helping her heal from her trauma."

On review, we agree with the trial court. Not only did the foster mother testify about the general issues the Child has faced, but she also explained some of the specific issues that require significant intervention and monitoring. For example, when the Child came to the foster family at eighteen months old, she was unable to eat solid food. The foster family embarked on routines to strengthen the Child's jaw muscles enough to allow her to eat. During this time, the foster family has been vigilant in monitoring the Child's food consumption to ensure proper nutrition.

Based on the Child's needs, foster mother testified that modifications to the home have been necessary, to-wit:

And then at home, our house is like a therapy center because we have the equipment. Everything our [physical therapist] recommends or [occupational therapist], we purchase for our home, whether that's stability

balls and climbers or fine motor games, language vocabulary games. Everything therapeutic we can think of, we just incorporate at home. Try to make it playful. So a lot of the times she just thinks she's playing but she's actually working on targeted skills.

From her own testimony, Appellant is unable to provide the Child with adequate housing or transportation, much less with the equipment and accommodations needed for her development. This factor clearly weighs in favor of termination of Appellant's parental rights.

### M. Tennessee Code Annotated Section 36-1-113(i)(1)(R)

As to whether Appellant's physical environment and home are healthy for the Child, the trial court found that because Appellant "resides in a treatment center where she cannot have custody of her child," her home "is not healthy and safe for the child." For the reasons previously discussed, we agree. This factor weighs in favor of termination.

### N. Tennessee Code Annotated Section 36-1-113(i)(1)(S)

Here, the trial court found that the factor regarding whether Appellant provided more than token financial support weighed in favor of termination. Its conclusion rested on Appellant's testimony that, although she had "provided some recent support," Appellant "could not confirm whether that support was for [this Child] or support in arrears for her other two children." We agree with the trial court's conclusion. There is no evidence that Appellant has provided any financial support for the Child since she was placed with DCS. As such, this factor weighs in favor of termination.

### O. Tennessee Code Annotated Section 36-1-113(i)(1)(T)

Concerning Appellant's mental or emotional fitness, the trial court noted the following issues: (1) Appellant "is in the early stages of addressing her mental and emotional health"; (2) "substance recovery is not linear; however [Appellant's] testimony reflected several traumatic experiences that she has left to address"; (3) Appellant "became so distressed during discussions about her substance abuse history and its impact on her other two children, that she refused to even look at the paperwork" while testifying; and (4) Appellant has difficulty hearing "about the minor [C]hild's extensive medical needs," because she recognizes that she "caused or contributed to them[.]" The trial court concluded that Appellant's "avoidance of confronting this [C]hild's profound needs is not tenable for being able to meet those needs and would be detrimental to effectively providing safe and stable care for the child." We agree.

As noted above, Appellant has relapsed several times during this custodial episode. Appellant testified as to ongoing mental and emotional issues that, by her admission, have

not been sufficiently addressed.  In the absence of such work, Appellant has demonstrated difficulty confronting past traumas and shortcomings, which would need to be resolved before Appellant could gain the emotional and mental fitness required to care for this Child. In view of this Child's substantial needs, and the negative effect that lapses in treatment and therapies would likely have on her progress, it is of the upmost importance that her parent be emotionally and mentally secure, and that his or her home be stable and fully equipped to meet her needs.

For these reasons and others discussed above, the trial court's findings on the statutory, best-interest factors are supported by a preponderance of the evidence, and the weight of those findings constitutes clear and convincing evidence that termination of Appellant's parental rights is in the Child's best interest.

## VI. Conclusion

For the foregoing reasons, we affirm the trial court's order terminating Appellant's parental rights to the minor Child.  The case is remanded to the trial court for such further proceedings as may be necessary and are consistent with this opinion.  Costs of the appeal are assessed to the Appellant, Ashley A.  Because Ashley A. is proceeding in forma pauperis in this appeal, execution for costs may issue if necessary.

s/ Steven W. Maroney
STEVEN W. MARONEY, JUDGE